UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

RICHARD A. SPANN-EL,

    Plaintiff,

    v.                                          CAUSE NO. 3:22-CV-450-JD-MGG

WARDEN,

    Defendant.

## OPINION AND ORDER

Richard A. Spann-El, a prisoner without a lawyer, was granted leave to proceed on an Eighth Amendment claim against the Warden of Miami Correctional Facility ("MCF") in his official capacity for injunctive relief needed to address depression and suicidal ideations.[1] (ECF 2.) He moves for a preliminary injunction requiring that he be immediately transferred to a different facility due to an alleged lack of treatment for these issues. (*Id.*) The court ordered a response to the motion, which has now been received. (ECF 7.) Any reply by Mr. Spann-El was due July 21, 2022. (ECF 8.) To date, none has been received. The matter is now ripe for adjudication.

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

---

[1] Mr. Spann-El has incurred three or more strikes for filing frivolous lawsuits, but the court determined that he met the imminent danger exception contained in 28 U.S.C. § 1915(g). (*See* ECF 2.)

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). On the first prong, "the applicant need not show that [he] definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of [his or her] case." *Id.* at 763 (quotation marks omitted). As to the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Furthermore, mandatory preliminary injunctions—"those requiring an affirmative act by the defendant" like the one Mr. Spann-El seeks—are "cautiously viewed and sparingly issued." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Additionally, in the prison context, the court's ability to grant injunctive relief is significantly circumscribed; any remedial injunctive relief "must be narrowly drawn, extend no further than necessary to remedy the constitutional violation, and use the least intrusive means to correct the violation of the federal right." *Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012) (citations and internal quotation marks omitted); *see also Rasho v. Jeffreys*, 22 F.4th 703, 711-13 (7th Cir. 2022) (outlining the strict limitations on granting injunctive relief in the prison setting).

According to Warden's responsive documents, Mr. Spann-El is currently classified as having Mental Health Code "A," a designation meaning that mental health professionals within Indiana Department of Correction ("IDOC") have determined him to be free of mental illness. (ECF 7-2 at 29.) He has held this classification throughout his incarceration and is not currently prescribed psychotropic medication, nor does he have a history of taking psychotropic medication while in the custody of the IDOC.[2] (ECF 7-1 at 1-4.)

Mental health care staff at MCF first evaluated Mr. Spann on May 20, 2020, after his arrival at the facility a few months earlier, and no clinically significant mental health symptoms were reported by him or observed by staff. (ECF 7-1 at 1-2; ECF 7-2 at 17.) He was also seen by mental health staff on the following dates after submitting a health care request or when staff members were conducting restricted housing mental health rounds:[3] August 24, 2020; November 30, 2020; December 2, 2020; December 9, 2020; January 25, 2021; February 19/2021; March 26, 2021; April 29, 2021; June 16, 2021; July 14, 2021; July 19, 2021; August 10, 2021; September 7, 2021; September 22, 2021; September 28, 2021; October 19, 2021; November 16, 2021; December 4, 2021; and December 6, 2021. During this time, his mental health code did not change. Mental health staff evaluating him did not diagnose him with any mental illness and did not find the prescription of psychotropic medications necessary. (ECF 7-1 at 2.)

---

[2] IDOC's public records reflect that Mr. Spann has been in prison since 2012. *See https://www.in.gov/apps/indcorrection/ofs/ofs?lname=spann&fname=richard&search1.x=0&search1.y=0.*.

[3] It can be discerned that Mr. Spann-El has been in restrictive housing during portions of his time at MCF because of disciplinary infractions.

On April 8, 2022, Mr. Spann-El made a request for mental health care. (ECF 7-1 at 2.) He had been seen by medical staff as recently as March 9, 2022, and March 18, 2022, for other medical problems, but there is nothing to indicate he raised a concern about his mental health at those visits. (*See* ECF 7-2 at 1-3, 31-32.) His April 8 request stated as follows:

> I have forwarded requests for mental health interview for certain obstacles in my life that is causing much anxiety, stress, PTSD. Family, custody issues, retaliations against me. Not having access to my normal everyday necessities as my life is in constant danger due to MCF's negligence and normal assistance not being given to me. Please schedule me for mental health.

(ECF 7-2 at 5) (errors in original). On that same date, custody staff also reported to mental health staff that Mr. Spann-El said he was having suicidal thoughts. (ECF 7-2 at 4-9.) He was seen and evaluated by a mental health provider that same day. (*Id.*)

During the evaluation, Mr. Spann-El denied suicidal ideations, plans, or intentions. Instead, he voiced frustrations about a variety of other issues, including disputes with custody staff, the mail system, not having a tablet, and owing a debt of approximately $5,000 to the prison. The provider noted that his appearance, eye contact, affect, and activity levels were within normal limits, and that he was cooperative, logical, and clear in his speech. (ECF 7-2 at 4.) It was noted that he "spoke about his primary goal of transferring to another facility" and reported that he "was in good mental health." (*Id.* at 5.) Ultimately the provider concluded that the issues he complained about were not mental health-related concerns. (*Id.* at 6.) She found no clinically significant signs of anxiety, cognitive issues, depression, impulse control,

psychotic symptoms, mania, or suicidality. (*Id.*) No further treatment was found to be needed, but Mr. Spann-El was told he could put in a request for health care as necessary. (*Id.*)

Mr. Spann-El was seen again by mental health staff on May 26, 2022, after it was reported that he had "slipped a note" to custody staff stating that he was suicidal. (ECF 7-2 at 10.) He was seen first by a nurse and according to the nurse's notes, he identified his concerns as being that "custody won't give me my property or toilet paper" and that he wanted "the basic necessities of life." (ECF 7-2 at 33.) He also told her that he thought "a suicide kimono would feel better" than the clothing he was wearing. (*Id.*)

He was then evaluated by a mental health provider, who asked him what was going on. (*Id.* at 10.) Mr. Spann-El reported that he needed to "escape some danger" and that he and his cellmate were not getting along. (*Id.*) He showed the provider some scratches on his body and said his cellmate had assaulted him. (*Id.*) He reported that he was not suicidal but was fearful for his life. (*Id.*) The provider noted that he talked about "lofty goals and ambitions, his successful attributes in the past, and what he wants to accomplish." (*Id.*) The provider did note "some heightened anxiety" but thought it might be situational due to the issue with his cellmate. (*Id.*) The provider also noted some "odd thinking at times," but found Mr. Spann-El to have a logical thought process overall. (*Id.*) The provider also found no clinically significant signs of depression, impulse control, psychotic symptoms, suicidality, mania, or cognitive issues. (*Id.*) The provider concluded: "Patient does not present any mental health issues at this time." (*Id.* at 11.) Due to the issue with Mr. Spann-El's cellmate, the provider notified a

correctional lieutenant, who attended the last part of the session. (*Id.*) The lieutenant discussed the issue with Mr. Spann-El and it was decided that he would submit paperwork to be placed in protective custody. (*Id.*)

Mr. Spann-El was evaluated again by a mental health provider the following day after he was placed in protective custody within the restrictive housing unit. (*Id.* at 15.) Mr. Spann-El complained about the lack of toilet paper and other hygiene items. (*Id.*) The provider noted that his appearance, eye contact, and activity levels were within normal limits, and that he was cooperative, logical, and clear in his speech. (*Id.*) It was also noted that his thought processes were logical and his judgment and insight were within normal limits. (*Id.*) The provider found no clinically significant signs of anxiety, cognitive issues, depression, impulse control, psychotic symptoms, mania, or suicidality. (*Id.*) Mr. Spann-El also denied any suicidal ideations at that visit. (*Id.*)

On May 31, 2022, he was evaluated by a mental health provider conducting a routine restrictive housing mental health assessment. (*Id.* at 20.) He voiced a desire to be transferred to another correctional facility, but the provider concluded that he "did not present with or report symptoms consistent with depression, anxiety, or formal thought disorder." (*Id.* at 24.) He was seen by mental health staff again on June 2, 2022, when he was released from the restrictive housing unit. (*Id.*) His mental health code continued to be designated as "A." (*Id.* at 26.) He was told that he could put in a health care request for any mental health concerns, which he said he understood. (*Id.* at 26-28.) On June 7, 2022, Mr. Spann-El initiated this lawsuit asking for an immediate transfer to another facility. (ECF 1-1.)

6

Under the Eighth Amendment, inmates are entitled to adequate medical care for serious medical conditions. *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021). However, they are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997); *see also Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("The Eighth Amendment does not require that prisoners receive unqualified access to health care."). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267. This includes appropriate measures to address the risk of self-harm from suicide. *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 565 (7th Cir. 2021).

Nevertheless, "mere disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019) (citation and internal quotation marks omitted). Instead, the court must "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (citation and quotation marks omitted). That deference extends to a medical professional's judgment that a patient does not need treatment because he is malingering or exaggerating his symptoms. *See Fitzgerald v. Greer*, 324 F. App'x 510, 515 (7th Cir. 2009); *Hughes v. Joliet Corr. Ctr.*, 931 F.2d 425, 428–29 (7th Cir. 1991).

Additionally, it is not enough that a medical professional be mistaken in his or her judgment, as "negligence, gross negligence, or even recklessness as the term is used in tort cases is not enough" to establish an Eighth Amendment violation. *Hildreth v. Butler*, 960 F.3d 420, 425–26 (7th Cir. 2020). To prevail, the inmate must show deliberate indifference, which is "a culpability standard akin to criminal recklessness." *Thomas*, 2 F.4th at 722. Put another way, the plaintiff must show that a medical provider's treatment decisions were "blatantly inappropriate." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

The medical records reflect that mental health care staff at MCF have diligently responded to Mr. Spann-El's requests for care and his reports of being suicidal, and have evaluated him for possible mental illness on a number of occasions. Their professional view is that he is not suffering from depression, is not in need of medication, and is not suicidal. Based on the documentation before the court, Mr. Spann-El has not demonstrated a likelihood of success on his claim that he is receiving constitutionally inadequate treatment for an objectively serious medical condition, or that he will suffer irreparable injury if he is not granted an immediate transfer or other relief while this case is pending.

For these reasons, the plaintiff's motion for a preliminary injunction (ECF 1) is DENIED.

SO ORDERED on July 29, 2022

/s/JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT

8